**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**DARRELL WILLIAMS,**

**Plaintiff,**

**v.**                                    **Civil Action No. 5:20-CV-00019**

**UNITED STATES OF AMERICA, et al.,**

**Defendants.**

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR
IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

Now comes the Defendants, by and through counsel, Maximillian F. Nogay, Assistant United States Attorney for the Northern District of West Virginia, and respectfully submit this Memorandum of Law in Support of their Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.

**STATEMENT OF THE CASE**

Plaintiff, Darrell Williams, Federal Register Number 26008-044, is a Federal inmate presently confined within the Federal Bureau of Prisons ("BOP").  Plaintiff brings the instant Amended Complaint against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, alleging that the United States was negligent for failing to protect him from an assault by another inmate.[1] *See* ECF No. 30, Plaintiff's Amended Complaint. Specifically, Plaintiff claims that, upon arrival at the United States Penitentiary in Bruceton Mills, West Virginia ("USP Hazelton"), he informed staff that "[he] had been assaulted by mid-west inmates because there was paperwork labeling [him] a snitch" but the BOP "[r]efused to protect him and acted negligence [sic]." *Id.*, ECF No. 30, PageID #232.

On August 28, 2020, Plaintiff filed a State Civil Rights Complaint pursuant to 42 U. S. C.

---

[1] Plaintiff filed his initial FTCA Complaint on February 3, 2020 [ECF No. 1] and subsequently filed an Amended FTCA Complaint on July 10, 2020 [ECF No. 30].

1

§ 1983, which the Court construed as a Complaint pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), against multiple named and unnamed defendants, including Warden J. Coakley, Randy Keyes, Francis Vankirk, and Myrna Bridges. *See* ECF No. 37. The *Bivens* Complaint was filed under the same case number as the FTCA Complaint, and the Defendants herein respond to both the allegations contained in the FTCA Complaint and the *Bivens* Complaint.

## **MATERIAL FACTS**

1.      On March 2, 2001, Plaintiff Darrell Williams was sentenced to an aggregate sentence of 351 months incarceration followed by 5 years of supervised release in the United States District Court for the Eastern District of Missouri for Conspiracy to Distribute in Excess of Five Hundred Grams of Cocaine and Escape From an Adult Correctional Facility, in violation of 21 U. S. C. § 846 and 18 U. S. C. § 751(A) respectively. While incarcerated, Plaintiff was sentenced to 41 months in the Southern District of Indiana for providing or possessing contraband in prison in violation of 18 U. S. C. § 1791. Assuming Plaintiff receives all projected good conduct time, he is scheduled to be released from prison on December 29, 2026. *See* Exhibit 1, Declaration of Jason Barclay (Barclay Dec.) at Attachment A, SENTRY Computerized Public Information Inmate Data for inmate Darrell Williams.

2.      Plaintiff was designated to USP Terre Haute from February 18, 2016 until he was transferred to USP Hazelton on April 18, 2017. While housed at USP Terre Haute, Plaintiff was found in possession of 0.45 ounces of methamphetamine and one 8 mg strip of Suboxone and was subsequently recommended for transfer. *See* Exhibit 1, Barclay Dec. at Attachment B, Inmate Investigative Report, Terre Haute, Case Number THP-17-0110.

3.      On April 18, 2017, Plaintiff arrived at USP Hazelton. Upon arrival, he completed a SIS

2

screening interview form.  Responding to the question :"Any reason/issue that would preclude you from being housed in General Population?," he wrote: " I brought to SIS attention that I have previously been assaulted by Mid West inmate." Exhibit 1, Barclay Dec. at Attachment C, SIS Intake Screening Interview Form.

4.    BOP Program Statement 5180.05 addresses categories of inmates that require special supervision and addresses the separation of individual inmates who may not be housed in the same institution with other specified individuals for various reason.  However, there is no BOP policy or procedure that mandates the separation of an individual inmate from an entire group or gang of inmates.  In the SIS screening interview form, Plaintiff did not identify any specific inmate that he was in danger from, and since he was not a separatee from any inmates housed at USP Hazelton, he was placed in the general population.  *See* Exhibit 1, Barclay Dec. at ¶ 7.

5.    On April 20, 2017, at approximately 6:52 p.m., USP Hazelton staff responded to an inmate-on-inmate assault in the F-A Housing Unit. Specifically, inmate X was observed striking Plaintiff with a lock attached to a belt to the head and upper torso.  Staff gave inmate X a direct order to stop his assaultive behavior, and the inmate complied.  *See* Exhibit 1, Barclay Dec. at Attachment D, Inmate Investigative Report, HAZ Case Number 17-0407.

6.    During the investigation, Plaintiff stated, "I don't know what is up with that guy. We knew of each other at Terre Haute but I've got nothing to do with him. That guy is just nuts." *Id.*

7.    Inmate X stated, "that motherfucker came here and started running his mouth about me being hot at Terre Haute so I took it to that bitch.  I've got to go at him for running his mouth or I get run up for being weak." *Id.*

8.    The investigation concluded as follows: "Based on the information and consensus of the interviews conducted, this investigator has determined [inmate X] initiated his assault on inmate

Williams based on his perception that inmate Williams was telling other MidWest inmates that [inmate X] was 'hot.'  Due to [inmate X's] perception he continues to hold animosity towards inmate Williams which will result in future violence if they were to continue placement at the same Bureau of Prisons facility. Inmates associated with the MidWest geographical area are speaking for the return of inmate Williams to general population and their refusal to speak about [inmate X] leads us to believe that [inmate X] is no longer welcome in general population and would be assaulted if he were to return." *Id*. Therefore, it was recommended inmate X receive a CMC assignment of separation from Plaintiff. It was also recommended inmate X remain in the Special Housing Unit until such time he can be transferred to another BOP facility where his security and programming needs could be met. *Id*.  Plaintiff was returned to the USP Hazelton general population.  *Id.*

9. On April 20, 2017, immediately after the assault, Plaintiff was seen in Health Services. A head-to-toe assessment noted a superficial abrasion with a quarter-sized contusion on his upper right cheekbone with no active bleeding noted. No other significant findings of injury were noted.  *See* Exhibit 1, Barclay Dec. at Attachment E, Health Service Clinical Encounter, dated April 20, 2017.

10. At the time of the assault, Plaintiff did not have a CIM assignment of separation from inmate X, the inmate who assaulted him, nor did Plaintiff have a CIM assignment of separation, a separation order, an order of protection, or any other current administrative order requiring his separation from any or all "Mid-West" inmates. In fact, as stated in the Inmate Investigative Report, the Mid-West inmates asked that Plaintiff be returned to general population, where he remained without incident until approximately sixteen (16) months later. *See* Exhibit 1, Barclay Dec. at ¶ 13.

4

11.     On August 1, 2018, at approximately 6:38 am, USP Hazelton staff responded to an inmate-on-inmate assault in the dining hall. Specifically, staff observed inmate Y striking Plaintiff 's head with a lock attached to a belt. Inmate Y refused orders to submit to restraints and was immediately placed on the ground by staff. During the investigation, inmate Y stated for the "[l]ast few weeks [Plaintiff] has been talking all kinds of shit, I told him to chill the fuck out.  He kept doing it, so I beat his ass." The investigation also determined that Plaintiff could not safely return to general population.   As a result, Plaintiff receive an assignment of separation from inmate Y, and Plaintiff was eventually transferred out of USP Hazelton. *See* Exhibit 1, Barclay Dec. at Attachment F, Inmate Investigative Report, HAZ Case Number 18-0683.

12.     Plaintiff filed an SF95 regarding the above negligence claims but did not file any administrative remedies regarding any of the *Bivens* allegations in this civil action.[2]

## **ARGUMENT**

## I.     **PLAINTIFF'S TORT CLAIMS ARE NOT COGNIZABLE UNDER THE FTCA AND MUST BE DISMISSED AS A MATTER OF LAW**

### A.     **The Discretionary Function Exception to the FTCA**

The FTCA waives the government's traditional immunity from suits for money damages based on the negligence of its employees and instead "permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred."  28 U.S.C. § 1346(b)(1); 28 U.S.C. §2674.  Thus, West Virginia substantive law applies to the case at hand.  In West Virginia, a plaintiff alleging negligence must prove three elements: (1) that defendant owed plaintiff a duty, (2) that defendant

---

[2] The exhaustion requirement for a *Bivens* claim is separate and distinct from the exhaustion requirements under the Federal Tort Claims Act ("FTCA"). *See Barnes v. Masters*, 2017 WL 4276829 (S.D.W.Va. Sept. 26, 2017) citing *Fulwylie v. Waters*, 2009 WL 3063016, at *5 (N.D.W. Va. Sept. 22, 2009).

negligently breached that duty; and (3) that plaintiff received injuries as a proximate result of that breach. *See Webb v. Brown & Williamson Tobacco Co.,* 2 S.E.2d 898, 899 (W.Va. 1939).

The FTCA provides that the BOP owes prisoners a duty of care to ensure the safekeeping, care, subsistence, and protection of all prisoners.  *See* 18 U.S.C. § 4042; *United States v. Muniz*, 374 U.S. 150 (1963).  West Virginia law further provides that the duty of care owed to inmates is one of reasonable care.  *See McNeal v. United States*, 979 F.Supp. 431 (N.D. W. Va. 1997). However, Congress created certain exceptions to the United States' liability as established by the FTCA.  One such exception is the discretionary function exception as set forth at 28 U. S. C. § 2680(a).  Section 2680(a) provides, in relevant part, that the provisions of the Federal Tort Claims Act shall *not* apply to any claim based upon an act or omission of an employee of the government exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance, or the failure to exercise or perform a discretionary function or duty on the part of the federal agency, or an employee of the government, whether or not the discretion involved be abused.

The discretionary function exception is the most important exception to the FTCA's waiver of sovereign immunity. *See McMellon v. United States*, 387 F.3d 329, 335 (4th Cir. 2004).  The exception expressly provides that the immunity waiver created by the FTCA "does not apply to claims 'based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'"  *Id.* at 335-36; *see also Jenkins v. United States*, 2019 WL 7593351 (D. S. C. 2019).  The exception demonstrates Congress's intent to permit the United States to be held liable in tort while protecting certain governmental activities from exposure to suit by private individuals. *See United States v. S.A. Impresa D.*

6

*Viacao Raiaerea Rio Grandense (Varig Airlines)*, 467 U.S.797, 808 (1984).  Congress enacted this exception to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, and to protect the government from liability that would seriously hinder efficient government operations.  *Id.* at 814; *see also Suter v. United States*, 441 F.3d 306, 310 (4th Cir. 2006).

Courts evaluating the applicability of the discretionary function exception to a claim under the FTCA must engage in a two-prong inquiry. *See U.S. v. Gaubert*, 499 U.S. 315, 323–24 (1991); *Berkovitz v. U.S.*, 486 U.S. 531, 536 (1988). "First, a court considers whether the challenged governmental conduct involves an element of judgment or choice. When a statute, regulation, or policy prescribes a specific course of action, there is no discretion and the exception does not apply." *Rich v. U.S.*, 811 F.3d 140, 144 (4th Cir. 2015) (citations omitted). Furthermore, the exception will not shield a government actor's acts or omissions that run afoul of the express or implied prescriptions of a statute, regulation, or policy. *See Baum v. U.S.*, 986 F.2d 716, 720 (4th Cir. 1993). If there is no statute, regulation, or policy that directs the government actor's conduct, or if it affords broad discretion in the implementation of its directives, a court must proceed to the second prong of the inquiry. *Id.*

The second prong requires a court to "determine whether the judgment was one that the exception was designed to protect, namely, a judgment based on considerations of public policy." *Rich*, 811 F.3d at 144. The Fourth Circuit has explained that "[t]his requirement is consistent with and mandated by the general purpose underlying the FTCA and the discretionary function exception, i.e., to balance Congress' desire to allow redress of injuries suffered through the negligence of government actors against the need to protect the government from being hobbled in the discharge of its policy-driven duties by tort suits." *Baum*, 986 F.2d at 720.

Nonetheless, the United States can be found negligent in its obligation to protect prisoners if it reasonably knew or should have known about a potential conflict between inmates. *See Saunders v. United States*, No. 5:14-CV-48, 2015 WL 997907, at *11 (N. D. W. Va. Mar. 6, 2015).

      **B.**    **To the extent Plaintiff avers the BOP should have been separated him from *all* Mid-West inmates, this allegation must be dismissed pursuant the discretionary function exception to the FTCA.**

Upon arrival at USP Hazelton on April 18, 2017, Plaintiff completed a SIS screening interview form.  Responding to the question :"Any reason/issue that would preclude you from being housed in General Population?," he wrote: " I brought to SIS attention that I have previously been assaulted by Mid West inmate." Exhibit 1, Barclay Dec. at Attachment C, SIS Intake Screening Interview Form. In his Amended Complaint, Plaintiff alleges that he "informed SIS Sue Doe that he feared for his life, and going to general population because he had previously been assaulted by Mid-West inmates, and there was a hit on his life because he had previously provided information to the government." *See* Complaint, ECF No. 30, PageID #237. However, in his Declaration attached as Exhibit 1, the SIS technician denies Plaintiff stated that his life was in immediate danger, that he asked for protective custody, or that he informed SIS that he was considered a "snitch." *See* Exhibit 1, Barclay Dec. at ¶ 6.

Program Statement 5180.05, *Central Inmate Monitoring System*, is meant to ensure a higher level of review for inmates who present special needs for management.  *See* 28 C. F. R. § 524.70. The Program Statement lists categories of inmates requiring central inmate monitoring (CIM) assignments to include the following:

    d.  <u>Disruptive Group</u>.  Inmates who belong to or are closely affiliated with groups (e.g., prison gangs), which have a history of disrupting operations and security in either state or federal penal (which includes correctional and detention facilities) institutions. This assignment also includes those persons who may require separation from a specific disruptive group.

f.  Separation.  Inmates who may not be confined in the same institution . . . with other specified individuals who are presently housed in federal custody or who may come into federal custody in the future.  Factors to consider in classifying an individual to this assignment include, but are not limited to, testimony provided by or about an individual . . . and whether the inmate has exhibited aggressive or intimidating behavior towards other specific individuals, either in the community or within the institution.  This assignment also includes those inmates who have provided authorities with information concerning the unauthorized or illegal activities of others.  This assignment may also include inmates from whom there is no identifiable threat, but who are to be separated from others at the request of the Federal Judiciary or U.S. Attorneys.

Other than defining which groups of inmate present "special needs", the Program Statement offers no further guidance on what type of heightened review is required. Further, the BOP has no policy or procedures that require separation of an inmate from an entire group or gang of inmates based on past encounters with individual gang members. *See* Exhibit 1, Barclay Dec. at ¶ 7.

Maintaining order and security in prison is the type of policy-based decision that the discretionary function exception shields. *See Cohen v. United States,* 151 F.3d 1338, 1344 (11th Cir. 1998) ("Deciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons."); *Dykstra v. U.S. Bureau of Prisons,* 140 F.3d 791, 796 (8th Cir. 1998) ("Prison officials supervise inmates based upon security levels, available resources, classification of inmates, and other factors. These factors upon which prison officials base such decisions are inherently grounded in social, political, and economic policy. We have no difficulty in concluding that the discretionary function exception applies to the correctional officer's decision not to place Dykstra in protective custody or to take other protective action."); *Calderon v. United States,* 123 F.3d 947, 951 (7th Cir. 1997) ("It is clear that balancing the need to provide inmate security with the rights of the inmates to circulate and

9

socialize within the prison involves considerations based upon public policy.").

    **C.**    **Plaintiff's allegations that he informed USP Hazelton staff that his life was in danger and requested "protective custody" are demonstrably false. Under these facts, the discretionary function exception must apply.**

Plaintiff, in essence, alleges that BOP officials knew or should have known that he faced a foreseeable risk of attack from Mid West inmates because he informed USP Hazelton staff that he was in danger and needed to be in protective custody.  *See* Complaint, ECF No. 30, PageID #237-239. Plaintiff attaches multiple "Inmate Request to Staff forms," also known as "cop-outs," which include the name or position of a staff member at the top and Plaintiff's requests. *See Id.* at PageID# 307-315. Although Plaintiff states he gave these "cop-outs" to staff, none are acknowledged as received by staff and, obviously, are all still in Plaintiff's possession. Prison officials assigned to Plaintiff's unit at USP Hazelton state that, once a cop-out is received, the request is answered and returned to the inmate with an explanation of whether the request was granted or denied. *See* Exhibit 2, Declaration of Francis Vankirk (Vankirk Dec.) at ¶ 3.

Here, none of the attached cop-out forms contain a response from USP Hazelton staff. In his attached Declaration, Francis Vankirk, a Correctional Counselor at FCC Hazelton, stated that "[he] do[es] not recall this inmate, nor do[es] [he] recall this inmate telling [him] he was in danger or asking for protective custody…[he] have never ignored an inmate's request for protective custody" ¶ 2. In her attached Declaration, Myrna Bridges, former unit manager at FCC Hazelton and current Executive Assistant at the Federal Correctional Institution Fort Dix, New Jersey, stated that "[she] do[es] not recall this inmate, nor do[es] [she] recall this inmate telling [her] he was in danger or asking for protective custody… If this inmate had reported that he was in danger, [she] would have contacted the Lieutenant to separate him from other inmates unital an investigation could be done." Exhibit 3, Declaration of Myrna Bridges (Bridges Dec.) at ¶ 2.

Additionally, Defendants Vankirk and Bridges declare that once an inmate requests protective custody, the inmate is immediately isolated from other inmates until a lieutenant can interview the inmate and conduct an investigation. *See* Exhibit 2, Vankirk Dec. at ¶ 2; Exhibit 3, Bridges Dec. at ¶ 2.

Plaintiff's statements after the 2017 attack contradict his allegations that he informed BOP staff members that he was in danger. When interviewed about the assault, Plaintiff stated: "I don't know what is up with that guy. We knew of each other at Terre Haute but I've got nothing to do with him. That guy is just nuts." *See* Exhibit 1, Barclay Dec. at Attachment D, Inmate Investigative Report, HAZ Case Number 17-0407. The investigation concluded that the Mid West inmates wanted Plaintiff returned to general population, and as a result, Plaintiff was subsequently returned to general population without incident for sixteen (16) months. *See Id.* at Attachment D, Inmate Investigative Report, HAZ Case Number 17-0407; *see also Id.* at Attachment F, Inmate Investigative Report, HAZ Case Number 18-0683.

Determination of an inmate's separation status is a decision grounded in the social, political, and economic policy of the BOP.  Thus, the assignment of a separation order is a matter of discretion on the part of BOP officials.  The facts of this case are analogous to *Usry v. United States*, No. 5:11CV141, 2013 WL 1196650, at *1 (N.D.W. Va. Mar. 25, 2013), aff'd, 545 F. App'x 265 (4th Cir. 2013). In *Usry*, the plaintiff argued that the government was negligent in placing him in general population with an inmate from a security threat group, the "Dirty White Boys ("DWBs")," because the United States knew that the DWBs posed a threat to him. The United States argued that there was no mandate that the plaintiff had to be separated from all DWBS, and that the plaintiff's attacker, although a member of the DWBs, was not a specific separatee from the plaintiff. Therefore, all decisions regarding the placement of the plaintiff and

11

his attacker were discretionary and fell within the discretionary function exception of the FTCA. The district court agreed and found the government's decisions to place the plaintiff and his attacker in the general population fell within the discretionary function exception to the FTCA. *See Usry*, 2013 WL 1196650, at *8.

Here, Plaintiff does not and cannot prove that he was in any danger from Mid West inmates nor that he requested protective custody. The attached "cop-out" forms clearly show that they were not received by BOP staff. Therefore, the BOP's decision to place Plaintiff in general population was within its discretion and falls within the discretionary function exception to the FTCA. Plaintiff's claims must be dismissed.

## II.   PLAINTIFF FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES AS TO HIS *BIVENS* CLAIMS

### A.   Plaintiff failed to exhaust his administrative remedies prior to bringing this civil action.

Courts have consistently required prisoners to exhaust administrative remedies prior to filing *Bivens* lawsuits. The well-established doctrine of exhaustion of administrative remedies provides, in order for an individual to assert claims for judicial relief, the individual must first exhaust the prescribed administrative remedy made available to him. *See Woodford v. Ngo*, 548 U.S. 81, 88-89 (2006) (citing *McKart v. United States*, 395 U.S. 185, 193 (1969)). Exhaustion allows for a potentially faster, more efficient solution to the inmate's problem, reduces the intrusion of the courts into prison administration, and provides a mechanism for fact finding before the matter reaches the court. *See McKart*, 395 U.S. at 193-95; *see also Reeder v. Phillips*, 2008 WL 2434003, at *5 (N.D.W.Va. June 12, 2008) (listing seven policies promoted by requiring exhaustion).

Proper exhaustion of administrative remedies demands compliance with an

agency's deadlines and other critical procedural rules. *See Woodford*, 548 U.S. at 90. "Failure to exhaust [administrative remedies] may only be excused upon a showing of cause and prejudice." *McClung v. Shearin*, 90 Fed.Appx. 444, 445 (4th Cir. 2004) (citing *Carmona v. Bureau of Prisons*, 243 F.3d 629, 634 (2d Cir. 2001)). Even where "the administrative process is unlikely to grant an inmate relief, Courts have enforced a longstanding policy favoring exhaustion." *See Homan v. U.S. District Court*, 2011 WL 4007391, at *2 (N.D.W.Va. 2011) (citing *Alexander v. Hawk*, 159 F.3d 1321, 1327-28 (11th Cir. 1998)). An inmate must complete all stages of the administrative remedy process with the applicable procedural rules before bringing a lawsuit in federal court. *See Woodford*, 548 U.S. at 88-89.

The BOP has established a four-tiered administrative remedy process. Title 28 C. F. R. § 542.10, et seq., sets forth the BOP's administrative remedy program, which provides formal review of any complaint that relates to any aspect of the inmate's confinement. Under this process, inmates are encouraged to first attempt resolution of their complaints informally by discussing the matter with a member of the unit team. *See* 28 C. F. R. § 542.13. If the attempt at informal resolution does not resolve the matter, the inmate may file a formal complaint with the Warden within 20 days of the date on which the basis of the complaint occurred. *See* 28 C. F. R. §§ 542.14. If an inmate is not satisfied with the Warden's response, he may appeal, using the appropriate form, to the Regional Director within 20 calendar days of the Warden's response. *See* 28 C. F. R. § 542.15(a). If the inmate is dissatisfied with the regional response, he may file an appeal with the National Appeals Administrator at BOP's Central Office in Washington, D.C. *Id.* The Central Office appeal is the final level of administrative review in the BOP's

administrative remedy process. *Id.* An inmate is only deemed to have exhausted his administrative remedies when he has filed a complaint at all of the foregoing levels.

This Court has routinely dismissed lawsuits filed by inmates for failing to exhaust administrative remedies where the inmate makes claims regarding staff misconduct in a *Bivens* lawsuit. *See Pagan v. Howell*, 2018 WL 7106227, *2 (N. D. W. Va. 2018) ("[E]xhaustion is a prerequisite to suit, and accordingly, Plaintiff was required to exhaust all available administrative remedies prior to filing his *Bivens* complaint in federal court."); *see also Lewis v. Federal Bureau of Prisons*, 2013 WL 65412, *3 (N. D. W. Va. 2013) (finding where the plaintiff could not prove he appealed at all levels, the court held, "[b]ecause exhaustion of all administrative remedies prior to filing the *Bivens* complaint is mandatory, this Court does not have the discretion to waive the plaintiff's requirement to exhaust his administrative remedies.").

Here, despite filing eighty-five (85) administrative remedies while housed at USP Hazelton between April 18, 2017 and December 12, 2018, Plaintiff did not file a single administrative remedy regarding prison staff's failure to separate him from Mid-West inmates. *See* Exhibit 4, Declaration of Howard Williams (Williams Dec.) at ¶ 5-7. Therefore, Plaintiff failed to exhaust his administrative remedies and his *Bivens* claims should be dismissed.

**B.  Even if Plaintiff had exhausted his administrative remedies prior to filing suit, Defendants must still be dismissed.**

Under the Eighth Amendment to the United States Constitution, prison officials have a duty to provide humane conditions of confinement, including adequate food, clothing, shelter, medical care, and personal safety. *See* Farmer v. Brennan, 511 U.S. 825, 832 (1994). Accordingly, prison officials must take reasonable measures "to protect prisoners from violence

at the hands of other prisoners."  Farmer, 511 U.S. at 833 (internal quotations omitted); *see also* Price v. Sasser, 65 F.3d 342, 345 (4th Cir. 1995); Hearns v. Rubenstein, 2009 WL 484724, * 6 (N. D. W. Va.).  To successfully state a claim for violation of the Eighth Amendment, an inmate must satisfy both the objective and subjective components of such a claim.  The inmate must allege a deprivation which was "sufficiently serious," and that in their actions or omissions, prison officials exhibited deliberate indifference to the inmate's health or safety.  *See Farmer*, 511 U.S. at 834.

In the context of a failure to protect claim, the inmate must show he was "incarcerated under conditions posing a substantial risk of harm," and that prison officials knew of and disregarded the excessive risk to inmate safety.  *Id*., at 834, 837.  Here, Plaintiff alleges that he "informed SIS tech Jane Doe that [he] feared being placed into general population because [he] had previously been assaulted by Mid-West inmates, and a hit had been placed on [his] life, by mid west federal inmates…" *See* Complaint, ECF No. 37, PageID #294.  Plaintiff then alleges that he was assaulted twice, once on April 20, 2017 and again on August 1, 2018. However, Plaintiff provides no evidence that the individual defendants (Randy Keyes, Francis Vankirk, Myrna Bridges, and Warden J. Coakley) knew of and disregarded an excessive risk to his health and safety. Plaintiff's allegations are unsupported by any evidence.  BOP staff deny that Plaintiff alerted them to any danger or requested to be placed in protective custody. *See* Exhibits 1, 2, 3, generally. Further, the investigations that followed each assault found that the assaults were the result of Plaintiff's interaction with his assailants prior to the assaults, and had nothing to do with a danger from Mid West inmates in general.  *See* Exhibit 1, Barclay Dec. at ¶ 11, 14. In fact, as stated hereinbefore, after the assault on April 20, 2017, the Mid West inmates specifically requested that Plaintiff return to general population, which he did without incident

15

until approximately sixteen (16) months later. *Id.* at ¶ 13.

Despite Plaintiff's baseless assertions that the individual defendants willfully violated his constitutional rights, there is absolutely no evidence that Plaintiff was "incarcerated under conditions posing a substantial risk of harm" and/or that prison officials knew of and disregarded the excessive risk to Plaintiff's safety. *See Farmer*, 511 U.S. at 834-837. Therefore, Plaintiff's *Bivens* claims must be dismissed.

C.      **The Individual Defendants are entitled to qualified immunity.**

Qualified immunity is an affirmative defense for the lawsuit rather than a mere defense to liability, so there is an "importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citations omitted).  Determinations of qualified immunity follow a two-step inquiry. First, "a court first must decide whether the undisputed facts show that the government official's actions violated the plaintiff's constitutional rights." *Danser v. Stansberry*, 772 F.3d 340 at 345-46 (4th Cir. 2014) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  If the plaintiff establishes a violation of the constitutional right, the second part of the inquiry requires a court to "determine whether the right at issue was 'clearly established' at the time of the events in question." *Danser*, 772 F.3d at 346 (citing *Saucier*, 533 U.S. at 201; *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

In this case, Plaintiff cannot maintain his Eighth Amendment claim because he cannot establish that Defendants had the required state of mind of deliberate indifference to Plaintiff's health or safety.  Plaintiff claims that the individual defendants ignored his repeated requests for safety.  However, as "evidence," he has only provided unanswered Inmate Request to Staff Forms, also known as "cop-outs." Investigations conducted after

16

the 2017 and 2018 assaults specifically contradict Plaintiff's allegations.  Therefore, the individual defendants are entitled to summary judgment based on the first prong of the qualified immunity test.

## <u>CONCLUSION</u>

Based upon the foregoing, the Defendants respectfully request that this Court dismiss Plaintiff's pending Amended Complaint pursuant to the Federal Tort Claims Act against the United States of America [ECF No. 30] and pending *Bivens* Complaint against Randy Keyes, Francis Vankirk, Myrna Bridges, and Warden J. Coakley [ECF No. 37].

Respectfully submitted,

RANDOLPH J. BERNARD
ACTING UNITED STATES ATTORNEY

By:    */s/  Maximillian F. Nogay*
Assistant United States Attorney
W. Va. Bar # 13445
United States Attorney's Office
P.O. Box 591
1125 Chapline Street, Suite 3000
Wheeling, WV  26003
(304) 234-0100
(304) 234-0112 fax
Max.Nogay@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 14th day of May, 2021, a copy of the foregoing

MEMORANDUM has been furnished for delivery via first-class mail to the following non-

CM/ECF participants:

Darrell Henry Williams (Register No. 26008-044)
USP CANAAN
P.O. BOX 300
3057 ERIC J. WILLIAMS MEMORIAL DRIVE
WAYMART, PA  18472

<div style="margin-left: 40%;">

RANDOLPH J. BERNARD
ACTING UNITED STATES ATTORNEY

By:    */s/  Maximillian F. Nogay*
       Assistant United States Attorney
       W. Va. Bar # 13445
       United States Attorney's Office
       P.O. Box 591
       1125 Chapline Street, Suite 3000
       Wheeling, WV  26003
       (304) 234-0100
       (304) 234-0112 fax
       Max.Nogay@usdoj.gov

</div>